UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
In re:                                          :          Chapter 11
                                                :          Case No. 20-10616 (SMB)
950 MEAT & GROCERY CORP.,                       :
                                                :
                                    Debtor.     :
-------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## GRANTING RELIEF FROM THE AUTOMATIC STAY

**A P P E A R A N C E S :**

PLATZER, SWERGOLD, LEVINE,
GOLDBERG, KATZ & JASLOW, LLP
*Attorneys for Debtor*
475 Park Avenue South, 18th Floor
New York, New York 10016

      Clifford A. Katz, Esq.
          Of Counsel

KAPLAN LEVENSON P.C.
*Attorneys for General Trading C. Inc. and*
  *GLC Market Street, LLC*
630 Third Avenue
New York, New York 10017

      Steven M. Kaplan, Esq.
          Of Counsel

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
*Attorneys for NewBank*
1350 Broadway, Suite 501
New York, New York 10018-0026

      Edward J. LoBello, Esq.
      Jordan D. Weiss, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      Prior to the Petition Date, Grocery Leasing Corp. ("GLC") and General Trading

Co., Inc. ("GTC", together with GLC, "General") sued the Debtor and several affiliates in

New Jersey State Court ("State Court Action").  The Defendants, including the Debtor, counterclaimed.  The Debtor subsequently commenced this chapter 11 case on the eve of the trial of the State Court Action triggering the automatic stay as to General's claims against the Debtor.  General now seeks relief from the automatic stay (the "Motion")[1] to continue the State Court Action.  The Debtor opposes the Motion[2] and NewBank, a secured creditor, joins in the Debtor's Opposition.[3]  For the reasons that follow, the Motion is granted.

## BACKGROUND

GTC is a wholesale food distributor to supermarkets.  GLC, an affiliate of GTC, is the tenant of a retail supermarket located at 946-956 Market Street, Paterson, New Jersey ("Premises").  Pursuant to a letter agreement, dated July 20, 2012 ("APA"),[4] and among other things, GTC sold to the Debtor all fixtures, furnishings and inventory located in the Premises for $2,262,000.  The same day, the Debtor and GLC entered into an Agreement of Sublease ("Sublease")[5] to enable the Debtor to operate the supermarket and GTC and the Debtor also entered into a security agreement ("Security Agreement")[6]

---

[1]    *Motion of General Trading Co. Inc., and GLC Market Street, LLC for Relief from Automatic Stay Under 11 U.S.C. § 362*, dated Mar. 18, 2020 ("*Motion*") (ECF Doc. # 27); *General Trading Co. Inc., and GLC Market Street, LLC's Reply in Further Support of Its Motion for Relief from Automatic Stay Under 11 U.S.C. § 362*, dated May 11, 2020 (ECF Doc. # 54).

[2]    *Debtor's Opposition to Motion of General Trading Co. Inc., and GLC Market Street, LLC for Relief from Automatic Stay Under 11 U.S.C. § 362*, dated Apr. 30, 2020 ("*Opposition*") (ECF Doc. # 48).

[3]    *NewBank's Joinder to Debtor's Opposition to Motion of General Trading Co. Inc., and GLC Market Street, LLC for Relief from Automatic Stay Under 11 U.S.C. § 362* (ECF Doc. # 52).

[4]    *Declaration of Steven M. Kaplan* ("*Kaplan Decl.*"), dated Mar. 18, 2020 Exhibit A (ECF Doc. # 26).

[5]    *Kaplan Decl.*, Exhibit B.

[6]    *Kaplan Decl.*, Exhibit C.

by which the Debtor granted GTC and its affiliates a security interest in all of the

Debtor's assets.  General apparently had business relationships with affiliates of the

Debtor and the Security Agreement included a cross-default provision.  As a result, the

Debtor's assets also secured the obligations of and performance by the affiliates.

The deal documents included, among other things, a requirement that the Debtor

purchase all of its inventory from GTC ("Supply Covenant").  Paragraph 4 of the APA

states in pertinent part:

> Buyer hereby agrees that. . . it shall purchase from Seller. . . all of Buyer's
> inventory requirements for the Store consisting of products which are sold
> or available for sale by Seller. . . at prices and upon terms then offered by
> Seller . . . to its customers generally.

Similarly, paragraph 48 of the Sublease states in relevant part:

> Subtenant hereby agrees that. . . shall purchase from GTC . . . all of Subtenant's
> inventory requirements for the Store ( as defined in the Letter Agreement)
> consisting of products which are sold or available for sale by GTC . . . at prices
> and upon terms then offered by GTC . . . to its customers generally.

Likewise, paragraph 12 of the Security Agreement states in pertinent part:

> TO INDUCE SECURED PARTY TO CREATE THE OBLIGATIONS AND TO ASSURE
> THE PROMPT REPAYMENT THEREOF, . . . DEBTOR SHALL PURCHASE ALL OF ITS
> INVENTORY REQUIREMENTS THAT ARE AVAILABLE FOR SALE BY SECURED
> PARTY (INCLUDING WITHOUT LIMITATION GROCERY, DAIRY, DELI AND FROZEN
> PRODUCTS). . . .

Finally, all three agreements are governed by New Jersey law.  (APA at ¶ 10; Sublease at

¶ 42; Security Agreement at ¶ 11.04.)

On October 23, 2017, the Debtor entered into a series of agreements by which it

became a member of the Key Food Stores Co-operative, Inc. ("Key Food") and agreed to

purchase 95% of its inventory through Key Food.  (*Reply Declaration of Steven M.*

*Kaplan,* dated May 11, 2020, Exhibit J ("*Kaplan Reply Decl.*")(ECF Doc. # 54-2).)  The

Debtor does not deny this but offers various justifications.  General sent a series of

3

default notices citing the breach of the Supply Covenant as well as other, pre-existing defaults including the installation of a refrigerated box and a storage container and playing music in and failing to maintain the parking lot.  (*See Kaplan Decl.*, Exhibit E.) By letter dated March 8, 2018,[7] GLC terminated the Sublease due to these ongoing defaults effective March 13, 2018 and sent a notice to the Debtor to vacate the Premises on March 19, 2018.[8]  The Debtor continues to occupy the Premises without GLC's consent.

General commenced the State Court Action against the Debtor, Ken Tavera, the Debtor's principal, and several other supermarkets owned by Tavera, including F.T. Meat Corp., Bronx 656 Food Corp., 323 Meat & Grocery, Inc. ("323 Meat"), and V.T. Meat & Grocery, Inc. ("V.T. Meat") (with the Debtor and Tavera, the "Defendants").  The First Amended Complaint, (*Kaplan Decl.*, Exhibit H), sought a judgment for possession of the Premises (Count I); breach of Sublease, APA and Security Agreement by the Debtor (Count II); breach of personal guaranty by Tavera (Count III); breach of various cross-default provisions by the Debtor and other Defendants (Count IV); unjust enrichment against the Debtor (Count V); account stated against the Debtor (Count VI); breach of the 323 Meat Security Agreement by 323 Meat (Count VII); and replevin against the Debtor and 323 Meat (Count VIII).

The Defendants' answer, (*Kaplan Decl.*, Exhibit I), denied the material allegations (although the Debtor does not dispute that it purchased inventory from third parties through Key Food) and asserted numerous counterclaims.  These included

---

[7]      *Kaplan Decl.*, Exhibit F.

[8]      *Kaplan Decl.*, Exhibit G.

breach of the APA against GTC for failing to carry the products that the Debtor needed to effectively compete (Counterclaim I); breach of contract by GLC for requiring the Debtor to remove storage containers from outside the Premises after agreeing to their installation (Counterclaim II); breach of the implied covenant of good faith and fair dealing by GTC and GLC for failing or refusing to supply inventory at commercially reasonable prices and taking the retaliatory action of wrongfully convicting the Debtor (Counterclaim III); breach of New Jersey's anti-trust and consumer fraud statutes by GTC for an improper requirements contract (Counterclaims IV, V); improper eviction by GLC (Counterclaim VI); breach of a rebate agreement by GTC for failing to pay agreed-upon rebates on inventory purchased by 323 Meat, V.T. Meat and the Debtor (Counterclaim VI); and breach of contract by GTC in failing to advertise on behalf of the Debtor despite charging a monthly fee for this service (Counterclaim VII).

Discovery was fully completed, and a bench trial was set for March 2, 2020. The Debtor filed this chapter 11 case on February 27, 2020, three days before the trial, triggering the automatic stay.

## DISCUSSION

The filing of a bankruptcy petition automatically stays "the commencement or continuation of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). The Court may grant relief from the automatic stay "for cause, including a lack of adequate protection of an interest in property," 11 U.S.C. § 362(d)(1), but does not otherwise define or provide an

example of "cause."  In determining the existence of "cause," courts are guided by the

factors enumerated in *Sonnax Indus., Inc. v. Tri Component Prods. Corp.* (*In re Sonnax*

*Indus., Inc.*), 907 F.2d 1280 (2d Cir. 1990) (the "*Sonnax* Factors"):

> (1) whether relief would result in a partial or complete resolution of the
> issues; (2) lack of any connection with or interference with the bankruptcy
> case; (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been
> established to hear the cause of action; (5) whether the debtor's insurer
> has assumed full responsibility for defending it; (6) whether the action
> primarily involves third parties; (7) whether litigation in another forum
> would prejudice the interests of other creditors; (8) whether the judgment
> claim arising from the other action is subject to equitable subordination;
> (9) whether movant's success in the other proceeding would result in a
> judicial lien avoidable by the debtor; (10) the interests of judicial economy
> and the expeditious and economical resolution of litigation; (11) whether
> the parties are ready for trial in the other proceeding; and (12) impact of
> the stay on the parties and the balance of harms.

*Id.* at 1286.  Not all of the factors are relevant in every case, *Schneiderman v.*

*Bogdanovich* (*In re Bogdanovich*), 292 F.3d 104, 110 (2d Cir. 2002); *Mazzeo v. Lenhart*

*(In re Mazzeo)*, 167 F.3d 139, 143 (2d Cir. 1999), and the Court need not assign equal

weight to each factor.  *In re Keene Corp.*, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994).

Here, several relevant Sonnax Factors weigh in favor of stay relief.  The State

Court Action involves a multi-party dispute and counterclaims by the Defendants.  The

automatic stay does not stay the claims against the non-debtors, *Teachers Ins. &*

*Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) ("It is well-established

that stays pursuant to § 362(a) are limited to debtors and do not encompass non-

bankrupt co-defendants."), or the counterclaims asserted by the Defendants, including

the Debtor, against General.  *Verragio, Ltd. v. AE Jewelers, Inc.*, No. 15 Civ. 6500 (CM),

2017 WL 1753478, at *1 (S.D.N.Y. Apr. 27, 2017) ("It is well-settled that an automatic

stay pursuant to 11 U.S.C. § 362(a) does not encompass litigation of a debtor's

counterclaims, because they are not claims brought "*against* the debtor.").  Hence, the

State Court Action involves numerous claims involving multiple parties that are not

stayed, (*see* Factor 6), and is the only proceeding in which all of the parties are present,

and the entire controversy can be resolved.  (Factor 1.)  Furthermore, the parties were

ready for a bench trial at the time the Debtor commenced this case, (Factor 11), and the

New Jersey courts are capable of conducting remote trials to the same extent as this

Court.[9]  In short, the continuation of the State Court Action, where all parties are

present and all claims have been asserted, will promote the interests of judicial economy

and the expeditious and economical resolution of the litigation.  (Factor 10.)  In

addition, although the New Jersey court is a court of general jurisdiction rather than a

specialized tribunal, all of the claims are governed by New Jersey law and the New

Jersey court has greater familiarity with that law, especially the various statutory claims

asserted through the Defendants' counterclaims.  (Factor 4.)

    The Debtor's Opposition mainly argues that the continuation of the State Court

Action will prejudice the Debtor's creditors and lead to duplicate litigation and the

possibility of inconsistent results.[10]  (Factors 7, 10.)  First, General filed a $2 million

---

[9]     New Jersey State Court's April 24, 2020 Second Omnibus Order, (*Kaplan Reply Decl.*, Exhibit M), states that to the extent practical, court operations, including hearings, will be conducted remotely through videoconferencing and teleconferencing. (*Id.*, ¶ 7(b).)  It expressly suspends *jury* trials, (*id.*, ¶ 1), but does not mention the suspension of non-jury trials like the State Court Action in the Superior Court. At oral argument, the Debtor's counsel offered information culled from a conversation with an unidentified clerk in the New Jersey court regarding the likelihood of a trial in the near future.  The Court does not credit this hearsay evidence.

[10]     The Debtor also argues that General's alleged retaliatory conduct of declaring defaults under the Sublease as retribution for Tavera's decision to use a different supplier for his other supermarkets evidences bad faith and commercial unreasonableness and could be grounds for equitable subordination of General's claim.  (Factor 8.)  (*See Motion* at ¶¶ 11, 58-59.)  The Debtor admits it moved its business from General to Key Food several weeks before General declared a default, (*Motion* at ¶ 11(f)), and the documents attached to the *Kaplan Reply Declaration* as Exhibit J confirm this.  General is not an insider or fiduciary of the Debtor.  It is a creditor.  In order to equitably subordinate a creditor's claim, a debtor must show that the creditor "committed some breach of an existing, legally recognized duty arising under

claim in the chapter 11 case commenced by the Debtor's affiliate, *JT Meat & Grocery Corp.,* Case no. 20-10060 (SMB). (*Opposition*, Exhibit A.) The proof of claim states that it "is the subject of ongoing litigation in NJ state court." (*Id.* at p. 2.) The affiliated debtor in that chapter case ("JT") is not a party to the State Court Action but is party to an agreement with General under which it guaranteed the obligations of its affiliates. Presumably, the reference to the "litigation in NJ state court" signifies that the claims against JT are based on the breaches of the affiliates' obligations that are the subject of the State Court Action.[11] Second, the Debtor's most valuable asset is its interest in the Sublease. General maintains that the Sublease was terminated pre-petition, cannot be assumed and is not property of the estate. The issue, critical to the Debtor's successful reorganization, will be decided in the State Court Action unless this Court prevents it and decides the question.[12]

---

contract, tort or other area of law. In commercial cases, the proponent must demonstrate a substantial breach of contract and advantage-taking by the creditor." *80 Nassau Assocs. V. Crossland Fed. Savs. Bank* (*In re Nassau Assocs.*), 169 B.R 832, 840 (Bankr. S.D.N.Y. 1994). The Debtor does not cite any authority to support the proposition that a creditor's exercise of its contractual right to terminate a contract based on the other party's admitted breach of a material covenant can subject the creditor's claim to equitable subordination. Accordingly, this factor does not weigh in favor of continuing the automatic stay.

[11]   The Debtor also points to other litigation pending in the *JT* chapter 11 case that supposedly implicates or overlaps with the same claims at issue in the State Court Action, but it is unnecessary to parse the pleadings in those other litigations. General's proof of claim in the *JT* case specifically states that it is based on the same issues involved in the State Court Action. I take as a given that the issues in the *JT* case and this chapter 11 case are intertwined.

[12]   The Debtor contends that even if it breached the Supply Covenant, the breach is curable through a monetary cure payment. (*Motion* at ¶ 11(e).) This misstates the law. The Debtor cannot assume the Sublease if it was terminated pre-petition under applicable non-bankruptcy law. 11 U.S.C. § 365(c)(3). If GLC properly terminated the Sublease pre-petition based on the Debtor's breach of the Supply Covenant (or for any of the other defaults cited by GLC), there is no Sublease to assume and no cure payment to make.

There are two responses.  One, the possibility of multiple litigations became inevitable once the Debtor filed this chapter 11 case rather than proceed to trial in the State Court Action. The automatic stay does not apply to General's claims against the non-debtors or the Defendants' counterclaims and there is no court aside from the New Jersey court where those claims can proceed.  Two, while the Sublease is undoubtedly critical to the Debtor's reorganization efforts, there is no pending proceeding before the Court that will allow it to finally determine the Debtor's interest in the Sublease.  The only proceeding the Debtor has commenced that implicates the existence of the Sublease and the question of its termination is a motion to assume and assign the Sublease as part of the sale of all of its assets.[13]  However, the Court cannot adjudicate the termination dispute between the Debtor and GLC as part of  the motion to assume.  As the Second Circuit has explained:

> [I]t is important to keep in mind that the bankruptcy court's "business judgment" in deciding a motion to assume is just that—a judgment of the sort a businessman would make.  In no way is this decision a formal ruling on the underlying disputed issues, and thus will receive no collateral estoppel effect.  In a given case, a bankruptcy court might decide that it would be beneficial for the trustee or debtor-in-possession to assume a certain contract because the court thinks it unlikely that a court would hold that the debtor had breached the contract, and thus assuming the contract would be a good "business judgment."  This "business judgment" could turn out to be wrong, however, if a later fact finder in an adversary proceeding decides that the underlying contract was in fact breached.  In such a case, the judge's wrong decision is simply an error of business judgment, not legal error.

---

[13]     *See Debtor's Motion for the Entry of:  (I) an Order, (A) Establishing Bidding Procedures for the Sale Of Assets, (B) Authorizing the Debtor to Select a Stalking Horse Bidder, (C) Scheduling an Auction, and (D) Approving the Form and Manner of Notice Thereof; (II) an Order Authorizing and Approving (A) Debtor's Entry into a Certain Asset Purchase Agreement, (B) the Sale of Assets Free and Clear of Liens and Other Interests, and (C) Assumption and Assignment of Certain Executory Contracts and Leases, and With Respect Thereto; (III) an Order Retaining VIP Realty, Inc. as Business Broker for the Debtor*, dated Apr. 30, 2020 (ECF Doc. # 44-1.)

*Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993).  At best, therefore, this Court can only make an informed business judgment whether it makes sense for the Debtor to spend its time and money pursuing an assumption and assignment of the Sublease and curing defaults when, it may turn out, the Sublease was terminated pre-petition and the Debtor had no Sublease to assume.

Finally, I note that balancing the harms caused by the impact of the stay, (Factor 12), also weighs in favor of stay relief.  For the reasons stated, the Debtor will not likely be able to assign the Sublease until the termination issue is resolved.  At a minimum, it may have to accept a depressed price from a buyer unwilling to assume the risk that a court will decide in the future that the Sublease had been terminated.  Delaying this resolution by continuing the stay will not benefit the Debtor or the creditors of this estate.  On the other hand, continuing the stay prevents GLC from exercising whatever rights it has to recover the Premises.

Accordingly, I conclude that the Motion is granted with one *caveat*.  If General recovers a money judgment against the Debtor, it cannot collect the judgment except through this bankruptcy proceeding.

So ordered.

Dated:   New York, New York
        May 20, 2020

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge